

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Newport News Division**

| | | |
|---|---|---|
| IN RE: | ) | UNDER SEAL |
| **Search and Seizure Warrants** | ) | CASE NUMBER 4:23sw___31 |
| | ) | 4:23sw___32 |
| | ) | 4:23sw___33 |
| | ) | 4:23sw___34 |

**AFFIDAVIT IN SUPPORT OF APPLICATION**

**FOR ISSUANCE OF A SEARCH WARRANT**

Your affiant, Jason Holsinger, being duly sworn and deposed, states as follows:

**INTRODUCTION**

1.     Your Affiant is a Special Agent with the United States Department of Justice, ("DOJ"), Federal Bureau of Investigation ("FBI"), and is assigned to the FBI Norfolk Field Office, Peninsula Resident Agency ("PRA") and is a member of the Safe Streets Peninsula Task Force ("SSPTF")[1] located in Newport News, Virginia ("VA"), which is conducting the investigation referred to in this Affidavit. Your Affiant is an investigative or law enforcement officer of the United States ("U.S.") within the meaning of Title 18, United States Code ("U.S.C."), Section ("§") 2510(7) and is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, U.S.C., § 2516.

2.     This SSPTF investigation involves **CORTEZ BUMPHUS** and others both known and unknown who are responsible for the distribution of multi-kilogram quantities of marijuana, cases of suspected Promethazine/Codeine, and the laundering of U.S. currency. The criminal activity of

---

[1]     In 1992, the FBI announced the Safe Streets Violent Crimes Initiative. This initiative was designed to establish FBI-sponsored proactive task forces whose primary focus is street gang and drug-related violence, and to address specific violent crime problems through the teaming of federal, state, and local law enforcement officers and prosecutors to conduct long-term, proactive investigations.

**CORTEZ BUMPHUS** involves overt acts that have been committed in the past five years within the Eastern District of Virginia ("EDVA"). Your Affiant makes this Affidavit in support of an Application for a Search Warrant to gather evidence of the trafficking, transportation, and distribution of illegal marijuana, and related criminal offenses.

## SEARCH LOCATION

3.      Your affiant makes this affidavit in support of an application for search warrants for the following locations and vehicle within the EDVA:

      a.     2022 Jeep Grand Wagoneer, maroon, bearing Commonwealth of Virginia registration "TVD-3925" and/or Vehicle Identification Number ("VIN") 1C4SJVAT1NS196604, and registered to "Dontae Lamont Dozier" of "2426 Sanderson Rd Chesapeake VA 23322" ("VIN: 1C4SJVAT1NS196604")

      b.     5124 Goldsboro Drive, #7, Hampton, Virginia ("TARGET LOCATION #1")

      c.     120 Dorothy Drive, Yorktown, Virginia ("TARGET LOCATION #2")

      d.     2022 Chevrolet Silverado, black, bearing Minnesota registration "JMW-389" and/or VIN 1GCPDBEK6NZ631685, and registered to "EAN HOLDINGS LLC" of 14002 E 21st, Suite 1500, Tulsa, Oklahoma ("VIN: 1GCPDBEK6NZ631685")

## CRIMINAL OFFENSES

4.      This request for search warrants is made in relation to the following offenses occurring in the EDVA and elsewhere:

      a.     Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of Title 21, U.S.C. Section 846;

## EXPERIENCE AND TRAINING OF AFFIANT

5.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code (U.S.C.), Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, U.S.C. Section 2516.

6.    As a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), I have been assigned to the Norfolk Division, Peninsula Resident Agency, as a full-time member of the Safe Streets Peninsula Task Force ("SSPTF") since 2014. I am also a certified Special Agent Bomb Technician ("SABT") responsible for render-safe operations against explosive and energetic threats and/or devices. Prior to my current assignment, I was assigned to the FBI's Washington Field Office, Special Surveillance Group, where I worked counterintelligence and counterterrorism investigations for approximately four years. In my current assignment, I am primarily responsible for investigating complex criminal enterprises led by drug trafficking organizations and criminal street gangs, to include drug smuggling conspiracies involving the illegal importation, distribution and possession with intent to distribute illegal narcotics, the distribution and trafficking of illegal firearms, and violent crime in aid of racketeering.

7.    Your Affiant has also become familiar with and utilized a wide variety of investigative techniques, including but not limited to the development of cooperating sources, source debriefings, physical surveillance, telephone call detail record analysis, the use of pen register and trap and trace devices[2], and the interception of wire and electronic communications. These investigations have led to numerous arrests and convictions for violations of federal laws.

## EXPERIENCE AND TRAINING OF THE INVESTIGATIVE TEAM

---

[2]    A pen register and trap and trace ("PRTT") is a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted. Basically, the PRTT captures the outgoing and incoming numbers dialed or pulsed from a target telephone line along with the corresponding date, time, and duration of the call.

8.      This SSPTF investigation is comprised of Special Agents, Task Force Officers, Forensic Accountants, and Analysts of the FBI as well as representatives from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Newport News Police Department (NNPD), the Hampton Police Division ("HPD"), the Virginia Department of State Police ("VSP"), and a contract analyst from the United States Attorney's Office ("USAO").  The respective Special Agents, officers, detectives, and analysts assigned to this SSPTF investigation are collectively hereinafter referred to as "the investigative team."

## TECHNIQUES USED BY DRUG TRAFFICKERS

9.      Based on the combined training and experience of members of the investigative team and their participation in other investigations involving federal violations of the Drug Control Act and the Money Laundering Control Act and related offenses, your affiant knows:

a.      That drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by law enforcement officers;

b.      That even though these assets are in names of someone other than a targeted drug trafficker, the drug trafficker actually owns and continues to use these assets and exercises dominion and control over them;

c.      That drug traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their on-going drug businesses;

d.      That it is common for drug traffickers to secrete contraband including marijuana, cocaine, and heroin, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations such as self-storage facilities over which they maintain dominion and control, for ready access, and to conceal these items from law

4

enforcement authorities;

e.      That, in order to accomplish this concealment, drug traffickers frequently build "stash" places within their residences, their businesses and/or other locations (including buried on the grounds thereof).  There are a number of publications available via the Internet instructing where and how to build "stash" places.  Copies of these types of publications have been found in the residences of drug traffickers;

f.      That it is common for persons involved in drug trafficking to maintain evidence relating to their obtaining, secreting, transferring and concealing of drugs and/or caches of drugs, large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, wire transfers, money drafts, letters of credit, safe deposit box keys, money wrappers, and other evidence of financial transactions.  These items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control such as storage facilities and/or buried on the grounds thereof;

g.      That drug traffickers amass large proceeds from the sale of drugs and they attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize the following instruments:  domestic and international banks and their attendant services, cashier's checks, money orders, money drafts, letters of credit, attorneys, accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

h.      That the sale of marijuana, cocaine, heroin, and other controlled substances generates large quantities of U. S. currency in small denominations (commonly referred to as "street money");

i.     That it is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for drugs, thereby leaving residue traces of the drug on the "street money." That law enforcement agencies own dogs that are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to drug-tainted currency negotiated at banks and concealed in the residences of drug traffickers and elsewhere;

j.     That it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

k.     That the Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed, may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

l.     That it is common for drug traffickers to exchange "street money" (small denominations) for large denominations of currency that can be concealed in secure locations within their residences, their businesses, and/or other locations, and/or buried on the grounds thereof, in order to amass a larger amount of currency in less area;

m.     That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

n.     That, in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000, or they provide false or

6

misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency, or they have someone conduct their currency transactions on their behalf;

      o.     That the Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed; in particular, drug trafficking; and,

      p.     That drug traffickers commonly have in their possession, that is, on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: drugs, drugs paraphernalia, jewelry, books, records, and U. S. currency.

### SOURCES OF PROBABLE CAUSE

10.    The facts comprising the basis for probable cause in this affidavit are derived from the following sources:

      a.     A review of investigative reports, interviews with law enforcement officers who have made arrests of **CORTEZ BUMPHUS**;

      b.     Physical surveillance of **CORTEZ BUMPHUS** and others, their residences, and places of employment conducted by members of the investigative team;

      c.     Independent investigation by the investigative team including, but not limited to, a review of government records from the National Crime Information Center (NCIC); El Paso Intelligence Center (EPIC); Treasury Enforcement Computer System (TECS); Autotrack; Lexis-Nexis; Federal Bureau of Investigation (FBI); ICE; DEA; Department of Motor Vehicles (DMV) records from various states; public utility and real estate records in VA and NC;

      d.     Information provided to the investigative team by a Confidential Source (CS);

e.      Technical Surveillance.

## BASIS FOR FACTS CONTAINED IN AFFIDAVIT

11.      Since this affidavit is being submitted only for the limited purpose of securing authorization for search warrants, your affiant has not included each and every fact known to the investigative team concerning this investigation. Rather, your affiant has set forth only those facts that are believed to be necessary to establish probable cause to search the aforementioned locations and vehicle. A summary of the relevant facts relating to the specific items of evidence are provided below.

12.      Your Affiant has personally participated in the investigation of the offenses described in this affidavit. As a result of your affiant's participation in this investigation and a review of reports made to your affiant by other members of the investigative team, your affiant is familiar with the circumstances of this investigation. On the basis of this familiarity, and on the basis of the other information, which I have reviewed and determined to be reliable, your affiant alleges the following:

## FACTS AND CIRCUMSTANCES

**Background**

13.      This SSPTF investigation shows, based upon multiple prior criminal investigations over the past several years as well as the current investigative activities, that there is probable cause to believe **CORTEZ BUMPHUS** and others yet unknown ("TARGET SUBJECTS") are utilizing 5124 Goldsboro Drive, #7, Hampton Roads, Virginia ("TARGET LOCATION #1") as a means of storing, packaging, and distributing illegal drugs for the purpose of obtaining illicit funds. And, that there is probable cause to believe **CORTEZ BUMPHUS** is utilizing 120 Dorothy Drive, Yorktown, Virginia ("TARGET LOCATION #2") as a residence for the storage of illicit funds obtained through the sale of illegal drugs. And, that VIN: 1C4SJVAT1NS196604 and VIN: 1GCPDBEK6NZ631685 are being utilized to facilitate these illegal activities.

8

14.   **CORTEZ BUMPHUS** is a three-time convicted felon whose criminal history includes

the following charges:

| Arrest Date | Location | Charges | Court Date | Disposition |
|---|---|---|---|---|
| 09/11/11 | Newport News, VA | Felony Possess Weapon by Felon | 10/25/11 | Nolle Prossed |
| 09/23/11 | Chesapeake, VA | Misdemeanor Possess Marijuana | 03/21/12 | Guilty – MSDMNR Possess Marijuana |
| 09/23/11 | Chesapeake, VA | Misdemeanor Obstruct Justice | 03/21/12 | Guilty – MSDMNR Obstruct Justice |
| 12/29/11 | Newport News, VA | Felony Drugs: Possess Sch I/II | 02/23/12 | Nolle Prossed |
| 04/07/12 | Newport News, VA | Felony Drugs PWID Sch I, II | 10/04/12 | Nolle Prossed |
| 04/07/12 | Newport News, VA | Felony Possess Firearm w/ Sch I or II | 10/04/12 | Nolle Prossed |
| 04/07/12 | Newport News, VA | Felony Possess Firearm by Felon | 10/04/12 | Nolle Prossed |
| 06/28/12 | Newport News, VA | Felony Firearm Use in Commission of Felony | 10/04/12 | Nolle Prossed |
| 06/28/12 | Newport News, VA | Felony Malicious Wounding | 10/04/12 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Malicious Wounding | 10/10/13 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Strangulation | 10/10/13 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Abduction | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Abduction | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Robbery: All | 05/08/14 | Guilty – Felony Steal Property |
| 07/19/13 | Newport News, VA | Felony Carjacking | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Robbery: All | 05/08/14 | Guilty – Felony Robbery |
| 07/19/13 | Newport News, VA | Felony Robbery: All | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Carjacking | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Malicious Shoot/Throw into Occupied Building | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Burglary | 10/22/13 | Dismissed |
| 07/19/13 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 10/22/13 | Dismissed |
| 07/19/13 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Firearm: Possess by Felon | 10/22/13 | Dismissed |
| 07/19/13 | Newport News, VA | Felony Malicious Shoot Throw Missile into Occupied Building | 05/08/14 | Nolle Prossed |
| 07/19/13 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 11/12/13 | No True Bill |
| 07/19/13 | Newport News, VA | Misdemeanor Disorderly Conduct | 10/08/13 | Nolle Prossed |
| 11/15/13 | Newport News, VA | Felony Malicious Wounding | 05/08/14 | Nolle Prossed |
| 11/15/13 | Newport News, VA | Felony Possess Firearm by Felon | 04/09/14 | Nolle Prossed |
| 11/15/13 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 05/08/14 | Nolle Prossed |
| 09/07/15 | Hampton, VA | Felony Eluding Police | 10/06/17 | Dismissed |
| 09/20/16 | Newport News, VA | Felony Murder: 1st Degree | 02/23/17 | Nolle Prossed |
| 09/20/16 | Newport News, VA | Felony Possess Firearm by Felon | 02/23/17 | Nolle Prossed |
| 09/20/16 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 02/23/17 | Nolle Prossed |
| 10/19/20 | Newport News, VA | Misdemeanor Failure to Appear | 12/03/20 | Guilty – MSDMNR Failure to Appear |
| 05/11/21 | Newport News, VA | Felony Firearm: Use in Commission of a Felony | 10/27/22 | Not Guilty |
| 05/11/21 | Newport News, VA | Felony Murder: 2nd Degree | 10/27/22 | Not Guilty |
| 05/11/21 | Newport News, VA | Felony Disregard Law Enforcement | 04/21/21 | Nolle Prossed |

15.     Despite the criminal history depicted above, law enforcement databases list **CORTEZ BUMPHUS** as a suspect in, or suspected of being involved in, approximately four homicides in the Hampton Roads area. Further review of additional records from law enforcement databases showed involvement in gang-related activity and various other violent crimes. According to information provided to the FBI, despite being incarcerated pending trial for the most recent homicide, **CORTEZ BUMPHUS** remained involved in an elaborate illegal drug trafficking conspiracy.

**History of the Residential Search Locations**

16.     In, about, or between May 2023 and June 2023, a Confident Source of information ("CS#1") brought the attention of the investigative team to TARGET LOCATION #1 and TARGET LOCATION #2. It was during this time that CS#1 provided additional details about the use of TARGET LOCATION #1 for the sole purpose of illegal drug trafficking, and the use of TARGET LOCATION #2 as the residence of **CORTEZ BUMPHUS** where illicit funds derived from the sale of illegal drugs are being kept. Both physical and Technical Surveillance were employed to corroborate this information. To date, based upon those observations, your Affiant represents that there is probable cause to believe TARGET LOCATION #1 is indeed being used for the purposes of illegal drug trafficking and other criminal activity. And, that TARGET LOCATION #2 is being utilized as a "residence" for **CORTEZ BUMPHUS**.

**Use of VIN: 1C4SJVAT1NS196604**

17.     The investigation has identified VIN: 1C4SJVAT1NS196604 as **CORTEZ BUMPHUS'** primary vehicle. VIN: 1C4SJVAT1NS196604 is registered in the name and address of another individual, however, this is common amongst drug traffickers trying to conceal their identity and the assets they have. The vehicle, a 2022 Jeep Grand Wagoneer is valued at nearly $100,000.

10

**CORTEZ BUMPHUS**, having been released from jail in October 2022, has no earned income or wages from the Commonwealth of Virginia for 2023. Therefore, your Affiant represents that there is no legitimate income known to the investigative team at this time that would support true financial ownership.

18.     Recently, physical surveillance and technical surveillance have identified the use of VIN: 1C4SJVAT1NS196604 in no less than seven suspected illegal drug transactions between June 25, 2023, and June 30, 2023. During a number of those transactions, large bags of suspected marijuana, and what appeared to be bottles resembling that of a medicine bottle, were observed during some of these transactions. Other interactions that occurred in or around this time period, though agents were unable to see what was exchanged, were consistent with a drug transaction based upon the training and experience of the investigative team. CS#1 corroborated a number of these drug transactions and confirmed **CORTEZ BUMPHUS** was selling illegal marijuana and "green" drink during this time.

**Use of VIN: 1GCPDBEK6NZ631685**

19.     On July 2, 2023, the investigation identified VIN: 1GCPDBEK6NZ631685 as another vehicle being utilized by **CORTEZ BUMPHUS** for the purpose of illegal drug trafficking. CS#1 provided that **CORTEZ BUMPHUS** was now in a black truck, specifically a "*Silverado*", and had conducted multiple drug transactions in that vehicle during and throughout the day. CS#1 also provided that **CORTEZ BUMPHUS** mentioned to a someone that he lived in Yorktown. On the morning of July 3, 2023, agents located 1 VIN: 1GCPDBEK6NZ631685 in the driveway of TARGET LOCATION #2. A query of the license plate confirmed VIN: 1GCPDBEK6NZ631685 was an Enterprise rental vehicle.

**Surveillance of TARGET LOCATION #1 and TARGET LOCATION #2**

20.     At various times during the investigation, surveillance of TARGET LOCATION #1 was instituted based upon information obtained from CS#1. The following are just some examples of observations consistent with frequent, short-duration comings, and goings from TARGET LOCATION #1; activity consistent with a "trap" house or drug-trafficking dwelling. The following were observed through physical surveillance and technical surveillance:

21.     On or about May 8, 2023, physical surveillance identified SUBJECT #1 and SUBJECT #2, both known drug traffickers, coming and going from TARGET LOCATION #1. SUBJECT #2 was observed carrying a black backpack through the front door and departing a short time later. Agents subsequently deployed technical surveillance in the area of TARGET LOCATION #1.

22.     On or about May 9, 2023, at approximately 3:23 p.m., technical surveillance revealed VIN: 1C4SJVAT1NS196604 parked near building 5128 Goldsboro Drive. At approximately 3:30 p.m., **CORTEZ BUMPHUS** was observed walking from the rear of TARGET LOCATION #1, through a grassy area near a dumpster (hereinafter referred to as "the cut"), with a black female. Moments later, VIN: 1C4SJVAT1NS196604 departed.

23.     On or about May 9, 2023, at approximately 3:38 p.m., a black male walked through the cut to the rear of TARGET LOCATION #1.

24.     On or about May 9, 2023, at approximately 4:00 p.m., a light-colored BMW sedan was observed parking near 5128 Goldsboro Drive. A black male exited and walked through the cut to the rear of TARGET LOCATION #1.  At approximately 4:03 p.m., the black male was observed walking through the cut back to the BMW. The black male entered the trunk of the BMW, retrieved a black backpack, and walked back to TARGET LOCATION #1. At approximately 4:06

12

p.m., the black male, carrying the black backpack, walked from TARGET LOCATION #1 to the BMW. The black male placed a black backpack back into the trunk of the BMW and departed.

25.    On or about May 9, 2023, at approximately 4:12 p.m., a black male was observed walking from the rear of TARGET LOCATION #1 and was no longer observed.

26.    On or about May 9, 2023, at approximately 5:01 p.m., VIN: 1C4SJVAT1NS196604 was observed returning to the area of 5128 Goldsboro Drive and parking in the same location. **CORTEZ BUMPHUS** and a black female exited the vehicle. One minute later **CORTEZ BUMPHUS** returned to the vehicle and moved to a different parking spot. He and the black female walked to the rear of TARGET LOCATION #1 at approximately 5:04 p.m.

27.    On or about May 9, 2023, at approximately 5:40 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1.

28.    On or about May 9, 2023, at approximately 5:46 p.m., SUBJECT #3 and a black male were observed walking through the cut to the rear of TARGET LOCATION #1.

29.    On or about May 9, 2023, at approximately 5:47 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1.

30.    On or about May 9, 2023, at approximately 6:34 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1 with a bag. Also, around this time, a white Honda Accord was observed parking near 5128 Goldsboro Drive. Minutes later, SUBJECT #4 was observed walking through the cut to the rear of TARGET LOCATION #1.

31.    On or about May 9, 2023, at approximately 6:37 p.m., a black male was observed walking through the cut to the rear of TARGET LOCATION #1.

32.    On or about May 9, 2023, at approximately 6:41 p.m., SUBJECT #4 was observed walking through the cut from the rear of TARGET LOCATION #1 with a black bag in hand. The aforementioned white Honda departed moments later.

33.    On or about May 9, 2023, at approximately 6:48 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1 with a backpack.

34.    On or about May 9, 2023, at approximately 7:44 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1 with a bag.

35.    On or about May 9, 2023, at approximately 8:12 p.m., two black males, followed by SUBJECT #3, were observed walking through the cut from the rear of TARGET LOCATION #1. One minute later, a vehicle matching the description of a rental vehicle SUBJECT #3 was known to be driving at the time departed the area of 5128 Goldsboro Drive.

36.    On or about May 9, 2023, at approximately 8:15 p.m., a black male was observed walking through the cut to the rear of TARGET LOCATION #1.

37.    On or about May 9, 2023, at approximately 7:44 p.m., a black male was observed walking through the cut from the rear of TARGET LOCATION #1.

38.    On or about May 10, 2023, at approximately 11:09 a.m., SUBJECT #5 was observed parking in the area of 5128 Goldsboro Drive and subsequently walking through the cut to the rear of TARGET LOCATION #1.

39.    On or about June 22, 2023, CS#1 notified the investigative team that **CORTEZ BUMPHUS** was seeking the assistance of a female to move firearms from TARGET LOCATION #1 to an unknown location. Surveillance of TARGET LOCATION #1 was instituted in response to this information. At approximately 10:18 a.m., a female was observed parking along Goldsboro Drive and walking with a cardboard box to the rear of TARGET LOCATION #1. Minutes later,

the female relocated her vehicle near the front door of TARGET LOCATION #1. A black male exited TARGET LOCATION #1 and handed something to the female. The female departed the area with the item handed to her. CS#1 provided **CORTEZ BUMPHUS** was very concerned about a "*black truck*" following the female form TARGET LOCATION #1.

40.     Your Affiant would note that the "*black truck*" referenced by **CORTEZ BUMPHUS** in Paragraph 39 was later determined to be a black SUV driven by an FBI agent involved in the surveillance that day. **CORTEZ BUMPHUS** was clearly concerned about law enforcement presence around TARGET LOCATION #1. CS#1 provided that **CORTEZ BUMPHUS** moved what your Affiant believes was contraband located within TARGET LOCATION #1 to a secondary location out of an abundance of caution. **CORTEZ BUMPHUS** continued to make several additional references to the "*black truck*", inquiring if others had seen the vehicle around TARGET LOCATION #1.

41.     On or about June 27, 2023, physical surveillance of TARGET LOCATION #2 was conducted and VIN: 1C4SJVAT1NS196604 was parked and unoccupied in the driveway. Agents noted several security cameras mounted at various points on the exterior of the home.

**Additional information provided by CS#1 about TARGET LOCATIONS**

42.     On or about May 10, 2023, at approximately 12:58 p.m., CS#1 provided that **CORTEZ BUMPHUS** was on his way to "*the spot*", or TARGET LOCATION #1. Additional information provided by CS#1 corroborated **CORTEZ BUMPHUS** was in the vicinity of Cambridge Apartments on Goldsboro Drive.

43.     On or about June 21, 2023, CS#1 provided that **CORTEZ BUMPHUS** was storing proceeds from illegal drug trafficking at his residence, believed to be TARGET LOCATION #2. **CORTEZ BUMPHUS** stated that on "*on my worst day I'm goin' in the house with twelve*

*thousand (12,000)*" and that this amount was on the "*worst*" day when drug sales are slow. He had explained that his goal was to make $12,000,000 and then get out of the drug game. CS#1 also provided that **CORTEZ BUMPHUS** told a female specifically "*Door 7*" when she was trying to locate TARGET LOCATION #1.

44.     On or about June 25, 2023, CS#1 provided that **CORTEZ BUMPHUS** believed a "*black truck*" and "*blue Tahoe*" followed the female with the firearms from TARGET LOCATION #1. CS#1 also provided there was "*all this weed*" in TARGET LOCATION #1. **CORTEZ BUMPHUS** commented he would just "*run*" and was willing to lose the drugs and money to avoid getting caught. **CORTEZ BUMPHUS** indicated that he would rather lose the "*tons and tons and tons of money*" he had obtained over his "*freedom*".

45.     Also, on or about June 25, 2023, CS#1 provided agents with information about a conversation **CORTEZ BUMPHUS** had where he described a safe containing approximately $400,000 being stolen from him. He bragged about having different types of drugs for various prices to ensure he will always have something a buyer wants.

46.     Over the course of the next several days, CS#1 provided that **CORTEZ BUMPHUS** was very concerned about what he perceived to be law enforcement around TARGET LOCATION #1 and that TARGET LOCATION #1 was "*hot*." He proceeded to sell illegal drugs from VIN: 1C4SJVAT1NS196604 as he moved around the area versus going back to TARGET LOCATION #1 out of fear he was being surveilled.

47.     On or about June 28, 2023, CS#1 provided that **CORTEZ BUMPHUS** was at TARGET LOCATION #2. Additional information obtained from CS#1 enabled agents to corroborate **CORTEZ BUMPHUS** being in the vicinity of the residence. Physical surveillance of TARGET LOCATION #2 provided further corroboration as **CORTEZ BUMPHUS**' vehicle, VIN:

1C4SJVAT1NS196604, the aforementioned maroon Jeep Grand Wagoneer, was parked in the driveway. It should be noted that each time his vehicle has been observed at TARGET LOCATION #2, it is centered in the driveway versus to one side or the other. Your Affiant believes this suggests no other vehicle or occupant frequents or resides at TARGET LOCATION #2.

48.     Later that same day, CS#1 provided **CORTEZ BUMPHUS** had obtained what was believed to be a resupply of illegal drugs, and corroborated **CORTEZ BUMPHUS** was in the area of Cambridge Apartments where TARGET LOCATION #1 is located. Later that evening, CS#1 provided **CORTEZ BUMPHUS** was at "*the spot*", or TARGET LOCATION #1, discussing product that cost between $1,600 and $1,650. CS#1 again corroborated **CORTEZ BUMPHUS** was in the vicinity of TARGET LOCATION #1 at the time.

49.     On or about June 29, 2023, CS#1 provided that **CORTEZ BUMPHUS** was selling Promethazine/Codeine or what is known as "*green*" drink. CS#1 also indicated that **CORTEZ BUMPHUS** was waiting on more "green" drink to arrive at TARGET LOCATION #1 as he was in the vicinity of Cambridge Apartments at the time.

50.     On or about June 30, 2023, CS#1 provided that **CORTEZ BUMPHUS** was at TARGET LOCATION #2. Additional information obtained from CS#1 enabled agents to corroborate **CORTEZ BUMPHUS** being in the vicinity of the residence.

**Differentiation between TARGET LOCATION #1 and TARGET LOCATION #2**

51.     TARGET LOCATION #1 and TARGET LOCATION #2 have been identified as two distinctly different locations believed to be utilized for two distinctly different purposes. TARGET LOCATION #1, as described and supported herein, is a location being utilized to facilitate illegal drug trafficking. TARGET LOCATION #2 is believed to serve as a primary residence for **CORTEZ BUMPHUS**. Based upon information provided by CS#1, and corroborated by physical

17

surveillance, **CORTEZ BUMPHUS** frequents TARGET LOCATION #2 during the "overnight" hours and into the morning hours of the day. He has also spoken specifically about each location, and according to CS#1 **CORTEZ BUMPHUS** typically refers to TARGET LOCATION #1 as "*the spot*" or "*the trap*" and TARGET LOCATION #2 as "*the crib*" or "*house*".

52.     CS#1 relayed that on several occasions in June 2023, **CORTEZ BUMPHUS** specifically stated "the spot" or "the trap" when referencing TARGET LOCATION #1. And, that he specifically stated "the crib" or the "house" when referencing what is believed to be TARGET LOCATION #2. For example, on or about June 18, 2023, **CORTEZ BUMPHUS** clarified during a conversation that he was not at "*the spot*" and stated, "*I told you I was at the crib*". On or about June 21, 2023, CS#1 provided that **CORTEZ BUMPHUS**, when speaking about illegal drug proceeds, made a reference to the money being taken into his "*house*", or what is believed to be TARGET LOCATION #2.

**CONCLUSION**

53.     Based upon the facts as described herein, your Affiant has described to the court a pattern of illegal drug trafficking by **CORTEZ BUMPHUS** from which thousands of dollars in illegal proceeds have been derived. There is probable cause to believe that illegal drugs not only exist within TARGET LOCATION #1, but also weapons to protect those illegal drugs. Additionally, there is probable cause to believe that the proceeds from the illegal drug trafficking not only exist within TARGET LOCATION #2, but weapons to protect those illegal proceeds. Finally, there is probable cause to believe that evidence of drug trafficking exists in VIN: 1C4SJVAT1NS196604 and VIN: 1GCPDBEK6NZ631685 that supports their use in facilitating the aforementioned illegal drug trafficking. The statements made by **CORTEZ BUMPHUS**, as provided by CS#1, implicate him in several violation of both Title 18 and Title 21 to include Conspiracy to Possess

with Intent to Distribute Controlled Substances, Possession of a Firearm in Furtherance of Drug Trafficking, Felon in Possession of Firearms, and Maintaining a Drug-involved Premises.

54.     TARGET LOCATION #1 is rented under the name of D.H., however, to date this female has not been seen at or entering the "*trap*". Your Affiant believes **CORTEZ BUMPHUS** utilized D.H. to rent the location so that he could conceal himself, on paper, from his involvement with TARGET LOCATION #1. Your Affiant knows from training and experience that it is common practice for drug traffickers to place residences, vehicles, and assets in the names of others in an attempt to hide their involvement. TARGET LOCATION #2 is believed to be a veteran-owned rental property being rented under the same circumstances as TARGET LOCATION #1, however, the investigative team has not contacted the owners. Your Affiant believes the potential risk of notification to **CORTEZ BUMPHUS**, even with good intention for the purpose of eviction, could result in the loss of evidence and inability to effectively execute these search warrants.

55.     The facts stated herein directly link TARGET LOCATION #1 to its suspected use as a drug-involved premises. Information provided by CS#1 suggests at times there could be hundreds of pounds of illegal marijuana and other drugs inside TARGET LOCATION #1, in addition to weapons and illicit proceeds. technical surveillance corroborated persons arriving at or entering into TARGET LOCATION #1 on multiple occasions where CS#1 provided advance notice that a drug transaction was about to take place at TARGET LOCATION #1. CS#1 provided on more than one occasion that **CORTEZ BUMPHUS** referenced taking those drug proceeds into his "house." The pattern-of-life analysis conducted via the use physical surveillance and other methods has corroborated **CORTEZ BUMPHUS** being at TARGET LOCATION #2 six nights between June 22, 2023, and June 30, 2023. Your Affiant believes this pattern is consistent enough

to suggest TARGET LOCATION #2 is the "house" where **CORTEZ BUMPHUS** is sleeping, and there is probable cause to believe illicit proceeds from illegal drug trafficking are being stored.

56.    Finally, the fact that VIN: 1C4SJVAT1NS196604 and VIN: 1GCPDBEK6NZ631685 were located at TARGET LOCATION #2 on mornings after CS#1 provided **CORTEZ BUMPHUS** was selling illegal drugs the previous day, or was at TARGET LOCATION #1 the previous day, suggests there is probable cause to believe VIN: 1C4SJVAT1NS196604 and VIN: 1GCPDBEK6NZ631685 were utilized to transport potential illicit proceeds or remaining illegal drug inventory from those events to TARGET LOCATION #2. The volume of occasions in which VIN: 1C4SJVAT1NS196604 and VIN: 1GCPDBEK6NZ631685 have been utilized in an illegal drug transaction suggests there is probable cause that some indicia of that illegal drug trafficking exists within the vehicle itself, be it drug scales, packaging material, residue, electronic devices, information within the vehicle's infotainment system if a smart phone was paired or connected, or even indicia of true ownership of the vehicle.

57.    Based upon the facts and circumstances contained herein, your Affiant respectively requests the issuance of search warrants for TARGET LOCATION #1, TARGET LOCATION #2, VIN: 1C4SJVAT1NS196604, and VIN: 1GCPDBEK6NZ631685.

## REQUEST FOR EXECUTION DURING ALL HOURS

58.    The criminal history of **CORTEZ BUMPHUS** is extensive and involves several charges related to violent crime. He also has an active warrant in the City of Newport News. Although found not guilty of the charges or they were nolle prossed, charges for murder were obtained on not one, but two occasions. Aside from the murder charges, there are a significant number of charges that involve firearms and shootings. The police databases reviewed by the investigative

20

team prior to preparing this Affidavit suggest **CORTEZ BUMPHUS** was a suspect or possibly involved in additional shootings and homicides.

59.     Your Affiant strongly believes the ability to execute these warrants at any time of day, ensures the greatest element of surprise is necessary to ensure maximum safety to law enforcement, the public, and **CORTEZ BUMPHUS** himself. Task Force Officers from the NNPD assigned to the SSPTF will subsequently take **CORTEZ BUMPHUS** into custody for the aforementioned outstanding state warrant. If agents are detected during approach, and **CORTEZ BUMPHUS,** or any other occupant of TARGET LOCATION #1 and TARGET LOCATION #2, flees prior to a containment perimeter being set, the likelihood of a manhunt for potentially armed violent criminals, at least one with an active warrant, greatly increases the risk to every resident in the immediate area.

60.     CS#1 has already provided that **CORTEZ BUMPHUS** is going to flee if he encounters law enforcement. He has also indicated there are multiple firearms inside TARGET LOCATION #1. CS#1 also provided that "drum" style magazines may exist inside the locations which are designed to carry an upwards of 50 to 100 rounds depending on the model. CS#1 provided that **CORTEZ BUMPHUS** indicated when he left TARGET LOCATION #1 for the night, someone else showed up. This is indicative a security being at the location to protect the illegal drugs, guns, and potential U.S. currency that are believed to be stored there. All of these elements raise the threat to law enforcement, the general public, and any potential occupants of TARGET LOCATION #1 and TARGET LOCATION #2.

61.     While there is substantially less intelligence that TARGET LOCATION #2 is fortified in the same manner, your Affiant knows that drug traffickers maintain firearms for security and protection in the residence and where their money is kept. **CORTEZ BUMPHUS** stated he had

a safe containing approximately $400,000 stolen from him, it is more than reasonable to believe an individual with his past would possess a firearm or other means to prevent that from occurring again.

62.     Lastly, the nature of the execution of this operation is fluid. Significant work will need to be done to determine who is at either location prior to execution, how many individuals are present, the presence of others or the general public in the area at the time, and several other safety factors. The likelihood of the general public being out and about between the hours of 10 p.m. and 6 a.m. is significantly less than during the daytime hours.

FURTHER YOUR AFFIANT SAYETH NOT.

Jason Holsinger, Special Agent
United States Department of Justice
Federal Bureau of Investigation

Read and Approved:

Eric M. Hurt
Assistant United States Attorney

Sworn and subscribed to before me
On this 3rd day of July, 2023

Lawrence R. Leonard
United States Magistrate Judge
Newport News, VA

## ATTACHMENT A

### DESCRIPTION OF THE LOCATIONS/THINGS TO BE SEARCHED

The location(s)/thing(s) to be searched are described as:

1.   2022 Jeep Grand Wagoneer, maroon, bearing Commonwealth of Virginia registration "TVD-3925" and/or Vehicle Identification Number ("VIN") 1C4SJVAT1NS196604, and registered to "Dontae Lamont Dozier" of "2426 Sanderson Rd Chesapeake VA 23322".



**ATTACHMENT A**

2.        5124 Goldsboro Drive, #7, Hampton, Virginia (TARGET LOCATION #1) is a

residential apartment located within Cambridge Apartments. The apartment has a brick facia on

the front and yellow siding on the rear. It is bordered to its left by one corner apartment unit, #8.

There is one window to the left of the front door, which is black in color and bears a "7" above it.

There is a rear entry door and a small rear curtilage area that is bordered with a black fence. The

apartment has what is believed to be a small exterior storage/closet(s) or enclosed space(s) located

outside of the apartment within the aforementioned gated area, further described as a "bump out"

when viewed from an aerial perspective.



**ATTACHMENT A**

3.      120 Dorothy Drive, Yorktown, Virginia (TARGET LOCATION #2) is a residential single-family home. The residence exterior is gray in color. The driveway of the residence fronts Dorothy Drive and leads to a two-car garage enclosed with a single door that is white in color. To the left of the garage door are the numbers "120" affixed in a vertical pattern. Above the garage is one double-hung window and two single windows with white trim. Two surveillance cameras are mounted underneath the fascia above the garage door. A walkway runs from the driveway to the left side of the residence where a main entry door is located. The main entry door is red in color with a glass storm door on the outside of it. The main entry door is bordered by two windows to the right and several windows to its left. As the residence is a two-story dwelling, several windows exist on the upper level.











## **ATTACHMENT A**

4.      2022 Chevrolet Silverado, black, bearing Minnesota registration "JMW-389" and/or VIN 1GCPDBEK6NZ631685, and registered to "EAN HOLDINSGS LLC" of 14002 E 21st, Suite 1500, Tulsa, Oklahoma ("VIN: 1GCPDBEK6NZ631685")



## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

Description of items to be seized/evidence sought:

1. Weapons, firearms, and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine-guns and other weapons, and any recorded receipts pertaining to firearms and ammunition;

2. Controlled and illegal substances/drugs/narcotics, and any over-the-counter ("OTC") medicine or prescription medicine associated with the use of Promethazine/Codeine;

3. Books, papers, records, receipts, notes, ledgers, and other papers relating to the transportation, trafficking, distribution, purchase, and sale of controlled substances;

4. Books, papers, records, receipts, notes, wire remitter receipts, bank statements, and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks, titles of ownership, safety deposit keys and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

5. Financial proceeds of dealing controlled substances, namely United States currency, cryptocurrency, precious metals, jewelry, and financial instruments, including stocks, bonds in amounts indicative of the proceeds of illegal narcotics trafficking;

6. Address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, source of supply, customers, financial institutions, and other individuals or businesses with

whom a financial relationship exists;

7. Papers, tickets, notes, schedules, receipts, and other items relating to domestic and international shipping or travel;

8. Papers, receipts, documents, notes, keys, access cards and/or codes relating to the rental of storage space, storage units, safety deposit boxes, or other offsite storage;

9. Photographs, including still photos, negatives, digital images, in particular photographs of co-conspirators, assets, and/or controlled substances;

10. Indicia of occupancy, residency, rental and/or ownership of the premises/vehicles described below, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, registration, and keys to:

    a. 5124 Goldsboro Drive, #7, Hampton, Virginia

    b. 120 Dorothy Drive, Yorktown, Virginia

    c. 2022 Jeep Grand Wagoneer, maroon, VIN: 1C4SJVAT1NS196604

    d. 2022 Chevrolet Silverado, black, VIN: 1GCPDBEK6NZ631685

    e. Any identified storage facility

11. Computers, tablets, and computer and electronic related media to include flash drives, and any other digital storage media, to include surveillance systems and recorded video;

12. Electronic mobile devices to include cell phones and "smart phones", and all data or information contained within the device, including:

    a. the number of the cell phone; lists of telephone numbers, names and addresses of the user of said telephone numbers stored in the phonebook or the contact list of the phone; records and/or data of all outgoing calls, incoming calls, and missed calls, voicemail messages, text messages, instant (IM) messages, e-mail addresses

and messages, IP logs, voice recordings, stored memos and calendars, still photographic images, video photographic images, GPS and other location data, installed applications or "apps" and the data related to or contained within, and any other stored electronic information;

b.  all stored passwords, encryption keys, access codes, SIM passwords, and geographical information;

c.  proof of ownership to include correspondence, registration keys or similar items.

d.  any communications (including, but not limited to telephone calls, voice mails, SMS and MMS text messages, instant messages, VoIP communications, data-based or non-traditional telephonic communications and e-mails);

e.  evidence of user attribution showing who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, address books, registry entries, configuration files, usernames and passwords, encryption keys, media access control (MAC) addresses, documents, browsing history, user profiles, e-mail, telephone and e-mail contacts, "chat," instant messaging logs, photographs, videos, and correspondence.